MEMORANDUM OF DECISION
On September 14, 1999, the Department of Children and Families, hereafter "DCF," filed petitions for the termination of the parental rights of Tonya R. and Ronald B. to their son, Isaiah B. The termination petition alleges that Tonya has failed to rehabilitate, so that she could parent her son. Isaiah was adjudicated an uncared-for child in prior proceedings. In addition, the petition alleges that there is no ongoing parent-child relationship between Isaiah and his mother. The allegations against Ronald B. are that he has abandoned the child and has no ongoing-parent child relationship with him. Connecticut General Statutes § 17a-112 (j)(3)(A), (B), and (D). On January 18, 2000, the respondent mother filed a motion to revoke Isaiah's commitment to DCF and on March 27, 2000 a motion to transfer guardianship to her grandmother, the child's great grandmother, Hattie P. All matters were consolidated for trial, which took place on August 23, 2000. Neither biological parent attended the trial, although counsel appointed by the court did attend and protect their interests. For the reasons stated below, the court grants the petition for termination of the parental rights of Tonya R. and Ronald B. The court also denies the respondent mother's motion to revoke Isaiah's commitment to DCF and the motion for transfer of guardianship.
From the evidence presented, the court finds the following facts:
 A. FACTS 1. Tonya R., Isaiah's mother.
Tonya is now nineteen years old. For some years prior to reaching the age of majority, Tonya was herself involved with DCF. She and her older sister lived with their maternal grandmother for years during their adolescence. When Tonya was fifteen, she gave birth to her son, Isaiah, on December 21, 1 996. At that time. Tonya was in foster care, as Hattie P. had on June 17, 1996 requested that DCF remove Tonya from her home. As noted by the DCF worker, "her relationship with her grandmother had been volatile and marked by domestic violence."[2]
CT Page 14271
Tonya and her son. Isaiah, were together only a short period of time when, on July 31, 1997, when he was six months old. Isaiah was removed from Tonya's care because she was homeless and could not then provide for him. He remained in foster care for two months and on September 5, 1997, he was adjudicated uncared-for and placed under protective supervision in his mother's care. Tonya then went with Isaiah to live with her grandmother, Hattie P. Less than six months later, Tonya was arrested for assault and risk of injury to a minor and after a short interval, she returned to live with her grandmother. In March, 1998, Hattie P. could no longer manage Tonya and relinquished her guardianship to another relative, where Tonya remained only two months, before coming back to live with her grandmother.
The legal proceedings concerning Tonya's son have also not been straightforward. On December 10, 1997, when Isaiah was almost one year old, Hattie P. moved for custody in the probate court. The probate court declined to provide custody to her and granted custody to DCF on December 17, 1997. On March 10, 1998, DCF filed a motion to modify the protective supervision to commitment and the case was transferred to the juvenile court. The court granted an order of temporary custody from the bench on that date. A fully contested hearing was held on the motion to modify disposition over two days beginning on July 13, 1998 and ending on August 24. 1998. At that time. Hattie P. was not found to be a suitable and worthy guardian for Isaiah and the motion was denied. Isaiah was again adjudicated as an uncared-for child and committed to DCF for a period of one year. His commitment to DCF has been extended since that time.
At the time of the original adjudication in 1997, Tonya received written expectations concerning the various services she would need to access to reunify with her son. The first of these were issued on August 4. 1997 and the expectations on September 5, 1997. Tonya was to participate in parenting and individual counseling and to have an evaluation for her drug use and follow any recommendations for treatment, which were made. She was to maintain adequate housing. She was also to remain in the home with Hattie P., a matter that became more problematic as time went on.
The DCF social worker testified that, unfortunately, Tonya was never able to complete the expectations set for her. Specifically, even at the time of trial, Tonya had unstable housing and had never completed a drug evaluation. The worker testified that Tonya had changed residence locations twenty-two times since 1997. She had been arrested in October 1999 and in March, 2000 and reported to DCF that she was involved in completing her community services as a result of a conviction for breach CT Page 14272 of the peace. Tonya also did not attend parenting classes at Catholic Family services in 1998. The Agency was unable to contact Tonya and closed their case concerning her. Tonya did not cooperate with Wheeler Clinic for a drug evaluation. She attended once in June, 1998 and then did not participate further. While the court can appreciate the difficulties of trying to raise her own child while she herself was still a child, she lacked the basic willingness to attempt to complete what was asked of her. The court concludes that reasonable efforts were made to reunify her with her child, but that Tonya R. was unwilling as well as unable to benefit from reunification services. On July 8. 1 999, the court found that reunification efforts were no longer appropriate.
2. Ronald B., the father of Isaiah.
Ronald is now twenty-four years old. DCF does not have much information concerning him. He has never been actively involved in the court proceedings concerning his son. In the beginning of the case in 1997, expectations were set for him. He signed them and has not complied with any. By the time of the commencement of the termination proceedings his whereabouts were unknown. Notice of the termination proceedings was given to him by publication, as his whereabouts continue to be unknown. The DCF social worker testified concerning her efforts just prior to trial to locate him. He has previously been incarcerated, but was not within the Department of Corrections at the time of the trial. His last known release date was in May, 1998. DCF was unable to locate Tonya to inquire about Ronald's whereabouts. Hattie P. had no address or phone number for him, although she had known his whereabouts in the past. The court finds that DCF made reasonable efforts to locate him.
By all reports, Ronald B. had visited with Isaiah only four times prior to the child's placement in foster care. He has had no contact with DCF since the child was removed in 1997. He has not sent cards, letters or gifts, nor inquired about the child's welfare. He has abandoned this child completely.
3. The child, Isaiah B.
Isaiah is now almost four years old. His birthday is on December 21. In his foster care placement, he received "Birth to Three" therapeutic services for his developmental delays, which include language, and social delays. In July, 1999, he was evaluated by Connecticut Children's Medical Center, who concluded that his difficulties mostly likely were related to environmental factors. In December. 1999. the Institute of Living's assessment recommended that he be provided with a stable home environment and not be moved to different families, that an early intervention program such as Head Start would be beneficial for him and that he should CT Page 14273 continue to receive speech and language services.
Isaiah fortunately is in a stable foster home, where he has bonded well to the foster family, who he views as his family. Isaiah has been in this home for over two years and has stabilized there. Isaiah's strongest connection is to his foster mother. When she needed to have some respite care, he was not able to sleep and thought he saw her van, at which point he was very excited because he thought his foster mother had returned. The worker noted that he appears very bonded to his foster mother. His foster mother wishes to adopt him, should he become available for adoption.
Isaiah has had visitation with his mother and his great-grandmother, Hattie P. The social worker testified that his mother has been inconsistent with her visitation and that the child does not recognize her as his mother. He also, in her opinion, does not seek comfort or affection from his biological mother. The worker testified that at times during the visitation, she observed power struggles between Isaiah and his mother and that sometimes the interaction between them is inappropriate, but that at other times it was appropriate. Isaiah also has contact with his great-grandmother who has visited whenever she is permitted to do so. He appears comfortable in her presence and she is appropriate with him. After these visits, the foster mother does observe some negative outcomes, such as after Isaiah has had too many sweets and junk food, he will vomit. On one occasion, he also received a toy tool set from Hattie, which he was using in a threatening way with the other children in the home. In his foster mother's opinion, his great-grandmother had spoken to him about how she was "going to get him back" and the child was confused about this.
 4. The mother's motion for Revocation of commitment and Transfer of Guardianship
Tonya has filed a motion for revocation of commitment to DCF and for transfer of guardianship to her grandmother, Hattie P. Tonya's counsel called Hattie in support of the motions. Hattie indicated her willingness to keep the child. She spoke of her own difficult experiences in foster care as a child and that she did not wish this to happen to Isaiah. She was questioned about her volatile relationship with Tonya and Tonya's older sister. She indicated that if Isaiah were placed with her, she would protect him from her granddaughter who would not have ready access to him. The earlier transcripts of the contested hearing on the motion for modification of disposition in 1998 were made exhibits in this trial and documented much of the volatile history that she and Tonya have had in the past. CT Page 14274
The court concludes that Hattie P. is sincere in her belief that she can provide for Isaiah. The court notes that she has made considerable effort to raise other relatives in the past. The evidence has shown that when the other children in her care were of an age to begin to assert their independence, Hattie was not able to manage them. At that point, when faced with significant conflict and difficulties, Hattie requested their removal. In connection with another child for whom she has provided care, Hattie was psychologically evaluated. The evaluator noted that Hattie does not accept any responsibility for the conflicts which arise and consistently places blame elsewhere. While Isaiah was only in her care for six months as an infant, Hattie's track record with other children, including Tonya, the mother of this child, causes the court significant concern.
Hattie does not have a close relationship with Isaiah at the present. He appears to enjoy her visits. However, if she took him in her home, she would need to be able to properly care for him and deal with her granddaughter as well. Her testimony reveals that she had no real appreciation of Isaiah's special needs. She also has no plan for how she would balance the competing claims of her granddaughter and great-grandson. While the court believes she is well intentioned, Hattie's ability to maintain order in her home remains in doubt.
 B. ADJUDICATORY TERMINATION FINDINGS 1. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided that this finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." Connecticut General Statutes § 17a-112 (j) (1). The court made such findings on July 8, 1999 (Swienton, J.) The court does find, from the clear and convincing evidence, that reasonable reunification efforts had been made prior to the date of these findings. Such efforts were hampered by Tonya's inability to benefit from services and her refusal to participate. The court concludes that both Tonya and Ronald were unwilling and unable to benefit from services for reunification with their biological son, Isaiah.
2. Adjudicatory findings
 (a) Tonya R.
CT Page 14275
Isaiah was adjudicated neglected both in 1997 and 1998 and committed to the care and custody of DCF. The court further finds, by clear and convincing evidence, that as of September 14, 1999, Tonya had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her child, she could assume a responsible position in his life. Connecticut General Statutes § 17a-112 (j)(3)(B). She did not participate in the services offered to her and apparently does not believe she requires professional help so that she could become a responsible parent.
"`Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532
(1986), see also; In re Juvenile Appeal, 1 Conn. App. 463, 477,473 A.2d 795 (1984). The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 1167,554 A.2d 722 (1989), In re Hector L., 53 Conn. App. 359, 366-367,730 A.2d 106 (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petitions, the court must consider not only Tonya's conduct prior to the filing of the petitions, but also her conduct after that time. In this case, this was a period of not quite one year, during which time there has been no change. Isaiah clearly requires stability and the experts believe he should not be moved. He is attached to his foster mother and has resided there for some time. Isaiah has no bonded relationship with his mother. It is, the experts find and the court concurs, not in his best interests to re-establish a tie to Tonya.
The second ground alleged is that Tonya has no ongoing parent-child relationship with Isaiah. To succeed on this ground, DCF must show the absence of "the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Statutes § 17a-112 (j)(3)(D); In re Savanna M., 55 Conn. App. 807, 815,740 A.2d 484 (1999). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645, 436 A.2d 290 (1980) (internal citations omitted). CT Page 14276
The court finds that this ground has also been established by clear and convincing evidence. While Isaiah knows his mother, he does not view her as his parent, the person who supplies his daily needs. To the extent he had such a relationship with her, the court concludes that it has now been replaced. To wait for more time to pass in order for Tonya to develop such a relationship when she has not engaged in any services and did not attend the trial, is detrimental to him.
 (b) Ronald B.'s Abandonment of Isaiah and his Failure to have an Ongoing Parent-Child Relationship with him.
Ronald has been completely uninvolved in Isaiah's life and his whereabouts have been unknown for some time. Abandonment is defined by Connecticut General Statues as the parent failing to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. Connecticut General Statutes § 17a-112 (j)(3) (B). Ronald has not been involved in his son's life, he has not called to inquire about him, not sent cards, letters or gifts and has completely abandoned him. The court makes this finding from the uncontradicted clear and convincing evidence. It follows from his abandonment of this child that Ronald also has no ongoing parent-child relationship with him and the court so finds.
D. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (k):
(1) Appropriate and timely services were provided by DCF to the family. These include services to benefit Isaiah as well as referrals for Tonya to deal with issues of parenting and substance abuse. DCF also provided visitation and case management services to the parents. No services were provided to Ronald B. as he has been unavailable for a long period of time.
2) As previously noted, the court finds by clear and convincing evidence, reasonable reunification efforts were made by DCF and that the parents were unable to benefit from them. In addition, the court found on July 8, 1999 that further efforts for reunification were not appropriate.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for Tonya and Ronald in the neglect proceedings and that neither were minimally able to CT Page 14277 fulfill them.
4) The feelings and emotional ties of the child with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties. Isaiah has been in his present foster home for over two years and is bonded to the family.
5) Finding regarding the age of the child: Isaiah will be four on December 21, 2000. He is now three years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return him to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As detailed above, the court finds that none of the parents has made any changes in their lives to accommodate the care and nurturing of this child.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parents. No such conduct is noted. DCF took steps for a number of years to assist this family.
 E. DISPOSITION The Best Interests of the Children.
In hearing a termination of parental rights case, the court must first determine whether or not the grounds for termination have been proven by clear and convincing evidence. If so, only then may it consider what action is in the best interests of the child at issue.
 "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a CT Page 14278 statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citations omitted; internal quotation marks omitted.) In re Danuael D., 51 Conn. App. 829, 835-37, 724 A.2d 546
(1999).
The court has found that the grounds for termination of the parental rights of the biological parents of Isaiah have been proven by clear and convincing evidence. The court has made the seven statutory findings required, which all weigh in favor of termination being in this child's best interests. The court concludes, from the clear and convincing evidence that Isaiah cannot wait any longer for permanency.
The court must also consider his best interests as to the issues raised by the motion to revoke commitment and the motion for transfer of guardianship. As has been held:
 "The burden is clearly upon the persons applying for the revocation of commitment to allege and prove that the cause for commitment no longer exists. Once that has been established, the inquiry become whether a continuation of the commitment will nevertheless serve the child's best interests." In re Cesar G., 56 Conn. App. 289, 292-293, 742 Conn. A.2d 428, [742 A.2d 428], (2000).
In this case, there can be no doubt that the cause for commitment still exists. Isaiah cannot be returned to his mother, who has not dealt with the behaviors, which led to his removal from her care. The court denies the motion for revocation of commitment.
Having denied the mother's motion, the court must next consider the motion for transfer of guardianship. At issue is whether or not placement of Isaiah with his maternal great-grandmother is in his best interests. The court finds that Hattie P. is well meaning and cares about her great-grandson. However, the court further finds from the clear and convincing evidence, that she does not have a close relationship with him and is not aware of his special needs. Given her past history with her grandchildren, including Tonya, the mother of this child, the court finds that she does not have the skills necessary to parent him. The court finds that she is not a suitable and worthy person to have guardianship of him, as the court previously determined after two days of contested hearings on August 24, 1998. (McLachlan, J.) The court therefore denies the motion for transfer of custody and guardianship to her. CT Page 14279
Next, the court must examine whether it is in the best interests of the child to terminate his parents' rights to them. The court finds that neither Tonya nor Ronald is in a position to care for Isaiah in the near future. The foster mother is the person to whom he is attached and given his special needs, he should not be moved again and required to form new attachments. Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal(84-CD), 189 Conn. 276, 455 A.2d 1313 (1983). In addition, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V.,25 Conn. App. 741, 748, 596 A.2d 930 (1992). The court concludes, from the clear and convincing testimony, that it is in the best interests of Isaiah to have permanency and stability in his life and that it is in his best interests that his parents' rights to him be terminated.
The court therefore orders that a termination of parental rights enter with respect to Tonya R. and Ronald B. The foster mother has expressed a desire to adopt Isaiah and the court directs that she be given first consideration in any adoption. The court appoints the Commissioner of the Department of Children and Families as the statutory parent. The court further orders that a permanency plan for Isaiah and a review plan for him be filed in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session